## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for ShoreBank, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | JURY DEMANDED |
| DREXTEL AMY, OLGA V. LAKES-BATTLE, JAMES BRINGLEY, ERIC RADER, and THURMAN SMITH, | ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for ShoreBank ("FDIC"), for its Complaint against Defendants Drextel Amy, Olga V. Lakes-Battle, James Bringley, Eric Rader, and Thurman Smith (collectively, the "Defendants"), states as follows:

## INTRODUCTION

1.      The FDIC brings this action in its capacity as Receiver for ShoreBank ("ShoreBank" or the "Bank"), pursuant to its authority granted by 12 U.S.C. § 1821. The FDIC seeks to recover more than $73 million in losses suffered because the Defendants – five of the Bank's former officers – acted negligently and grossly negligently and breached their fiduciary duties by disregarding the Bank's loan policy, underwriting guidelines and prudent lending practices in connection with 20 acquisition, development, and construction ("ADC") loans, 6 commercial loans, and 2 commercial real estate ("CRE") loans approved between December 2005 and June 2009 (collectively, the "Target Loans").

2.      The acts and omissions that give rise to the Defendants' liability include, but are not limited to: (i) failing to obtain borrower and guarantor financial information; (ii) relying on outdated, unverified, and inadequate financial information for borrowers and guarantors; (iii) failing to perform and/or ensure that global cash flow analyses were performed prior to loan approval; (iv) failing to properly assess the repayment ability of borrowers and/or guarantors; (v) failing to ensure that loans were secured by sufficient collateral; (vi) extending credit in excess of permitted loan-to-value ("LTV") ratio limits; (vii) approving loans in excess of individual approval authority and without proper committee approval; (viii) failing to obtain appraisals prior to loan origination; (ix) approving loans without adequate documentation; and (x) permitting debt service coverage ratios ("DSCR") below minimum requirements.

3.      This tortious conduct, which deviated from the standard of care, continued for years, and caused the Bank damages in excess of $73 million.

4.      In this lawsuit, the FDIC seeks to collect damages resulting from the Defendants' negligence, gross negligence, and breaches of fiduciary duty, including, but not limited to, the Bank's lost operating capital.

## PARTIES

### Plaintiff

5.      The FDIC is a corporation organized and existing under the laws of the United States of America. 12 U.S.C. § 1811, *et seq.* The FDIC was appointed as Receiver for the Bank by the Illinois Department of Financial and Professional Regulation – Division of Banking ("IDFPR") on August 20, 2010. Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC succeeded to all rights, titles, powers, and privileges of the Bank and the Bank's shareholders,

account-holders, and depositors, including, but not limited to, the Bank's claims against the Bank's former officers as set forth herein.

**Defendants**

6.  Drextel Amy ("Amy") was a Senior Vice President ("SVP") at the Bank from September 2000 to September 2001, and was President of the Detroit region of the Bank from September 2001 to April 2009. Amy was a member of the Business Banking Loan Committee ("BBLC") from at least July 2005 to April 2009. He resides in Novi, Michigan.

7.  Olga Vikki Lakes-Battle ("Battle") was the SVP and Director of Commercial & Industrial Lending at the Bank from August 2003 to August 2010, and a member of the BBLC from at least July 2005 to August 2010. Battle resides in Flossmoor, Illinois.

8.  Eric Rader ("Rader") was a Vice President in the Bank's Cleveland banking region from August 2005 to August 2010, and a member of the BBLC from at least July 2005 to August 2010. He resides in Cleveland, Ohio.

9.  Thurman Smith ("Smith") was a SVP and the Chief Lending Officer ("CLO") at the Bank from May 2005 to March 2008, Chief Credit Officer ("CCO") at the Bank from May 2005 to January 2008, and Chairman of the BBLC from at least July 2005 to March 2008. He resides in Chicago, Illinois.

10.  James Bringley ("Bringley") was a SVP and Head of Multi-Family Real Estate from October 1974 to September 2009. He was Chairman of the Multi-Family Real Estate Committee ("MFREC") from at least July 2005 to September 2009. Bringley resides in Homewood, Illinois.

<u>**JURISDICTION AND VENUE**</u>

11.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

12.     The Court has personal jurisdiction over the Defendants pursuant to 735 ILCS § 5/2-209, *et seq.* because, among other things, the FDIC's claims arise from the Defendants transacting business, committing tortious acts, and breaching fiduciary duties in Illinois.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the FDIC's claims occurred in this judicial district.

<u>**FACTUAL BACKGROUND**</u>

**Bank History**

14.     ShoreBank was a state-chartered nonmember bank, regulated by the IDFPR and FDIC. The Bank's deposits were insured by the FDIC.

15.     The Bank was established on January 21, 1939, as South Shore National Bank of Chicago. In 1973, ShoreBank Corporation acquired the Bank and changed its name to ShoreBank. The Bank was a Community Development Financial Institution ("CDFI") established to stimulate private investment in Chicago's South Shore neighborhoods through deposit and lending services.

16.     In March 2001 and September 2005, the Bank merged with ShoreBank Detroit and ShoreBank Cleveland. In November 2006, the Bank acquired Greater Chicago Bank. By the time it was closed, the Bank operated 15 banking branches, including branches in the Cleveland, Ohio, and Detroit, Michigan banking regions.

4

**ShoreBank's Loan Policy and Loan Approval Authority**

17.　　At all relevant times, the Bank maintained a loan policy ("Loan Policy") setting forth the Bank's lending requirements and restrictions. The Loan Policy delegated loan approval authority to a Loan Committee ("Loan Committee"). However, the Loan Committee itself did not approve loans. Instead, four departmental committees were created to review and approve loans for their respective departments – Multi-Family Real Estate, Business Banking, Mortgage Lending, and Detroit Mortgage Lending.

18.　　According to the Loan Policy, all loans in excess of an individual loan officer's approval authority were to be reviewed and approved by the applicable departmental committee.

19.　　Certain Loan Policy requirements were applicable to all MFREC and BBLC loans, including review and analysis of: (i) personal financial statements, income tax returns, and credit reports of borrowers and guarantors; (ii) historical business financial statements reflecting cash flow and past operating performance; (iii) external environment and general economic condition; (iv) cash flow projections; (v) adequacy of the primary and secondary sources of repayment; and (vi) management experience of the borrower or management team.

20.　　The Loan Policy also required: (i) loan proposals or presentations for all loans; (ii) complete appraisals for any commercial or real estate loan for $250,000 or more; (iii) Risk Management Committee approval for loans to a single borrower that result in $15 million or more of aggregate exposure to the Bank; (iv) global cash flow analyses; and (v) budgets and disbursement monitoring for construction loans.

21.　　The subcommittees (as opposed to individual officers) were required to approve all new loans or loan renewals that exceeded individual credit authority.

22.     The Loan Policy further required that borrower credit files were to include financial statements, tax returns, loan presentations, loan approval documents, credit and agency reports, reference letters, applications, inspections, appraisals, correspondence, memoranda of discussions and site visits, and any other information necessary to document the borrower's past relationship and current condition.

23.     The MFREC addendum to the Loan Policy required that MFREC loans have a minimum 80 percent LTV ratio and that borrowers pay the right price for buildings and be able to complete the project within or below market costs.  MFREC Chairman Bringley had individual authority to approve loans up to $500,000, and the MFREC had authority to approve loans over $500,000.

24.     Although there were seven members of the MFREC, Bringley exercised complete control over the MFREC's loan approval process and decision-making.  Bringley reviewed and predetermined approval of loans and did not take other committee members' concerns regarding loans into consideration when approving loans.

25.     BBLC members Amy, Battle, and Rader each had individual authority to approve loans up to $500,000, while BBLC Chairman Smith had individual authority to approve loans up to $1 million.  The BBLC was required to approve loans above these individual authorities.

## THE 28 TARGET LOANS

26.     The Defendants ignored the Bank's Loan Policy requirements and prudent lending practices throughout the time period at issue.  The Defendants also repeatedly failed to undertake the analysis necessary to evaluate loans and approved loans without sufficiently informing themselves of information necessary to evaluate them fully.

27. Between December 2005 and June 2009, the Defendants were negligent, grossly negligent and breached their fiduciary duties to the Bank in approving at least the 28 Target Loans, which totaled approximately $95.78 million and resulted in losses to the Bank of at least $73 million.

28. The Defendants originated, recommended, approved, and/or administered the 28 Target Loans in violation of the Bank's Loan Policy and sound and prudent banking practices. As detailed below, each Target Loan exhibited one or more of the following violations of the Bank's Loan Policy: (i) failing to obtain borrower and guarantor financial information; (ii) relying on outdated, unverified, and inadequate financial information for borrowers and guarantors; (iii) failing to perform and/or ensure that global cash flow analyses were performed prior to loan approval; (iv) failing to properly assess the repayment ability of borrowers and/or guarantors; (v) failing to ensure that loans were secured by sufficient collateral; (vi) extending credit in excess of LTV ratio limits; (vii) approving loans in excess of individual approval authority and without proper committee approval; (viii) failing to obtain appraisals prior to loan origination; (ix) approving loans without adequate documentation; and (x) permitting DSCRs below minimum requirements.

29. Of the 28 Target Loans, Bringley, or purportedly the MFREC, approved 20 of them, and the BBLC approved the remaining eight.

**The 20 Target Loans Approved by Bringley**

**Loans to Borrower A**[1]

30. Between February 2006 and September 2008, Bringley approved five loans to

---

[1] The names of the individual borrowers and guarantors are not included herein to protect their privacy. The names of these borrowers and guarantors will be provided once an appropriate protective order is in place.

Borrower A, totaling $1.52 million.

### Loan 65085

31.     On February 6, 2006, Bringley approved the first of the five loans, loan number 65085 ("Loan 65085") for $660,000. It was secured by Borrower A's 24-unit apartment building located at 7440-7444 S. Phillips (the "Phillips Property") in Chicago, and was requested to pay off the existing $560,000 mortgage on that property and provide $100,000 cash to Borrower A for personal expenses and improvements on the property.

32.     The repayment terms for Loan 65085 were 240 equal payments of principal and interest. The loan was set to mature on March 1, 2026. Pursuant to the loan proposal, Borrower A had an adjusted gross income of -$21,593. Repayment sources for the loan were: (i) cash flow from rental units owned by Borrower A; and (ii) liquidation of the collateral property.

33.     Bringley's approval of Loan 65085 violated the Bank's Loan Policy and safe and sound banking practices, and lacked due care in several respects, including, but not limited to, the following:

    a.    Bringley exceeded his $500,000 individual authority in approving Loan 65085 and failed to seek the required committee approval.

    b.    Bringley failed to analyze Borrower A's ability to repay the loans.

    c.    Bringley failed to perform or require a global cash flow analysis for Borrower A.

    d.    Bringley failed to require Borrower A to provide the required financial statements or complete a loan application.

    e.    Bringley failed to obtain a credit report for Borrower A.

    f.    The cash flow projections used in the loan proposal were simply estimates provided by Borrower A and were not verified.

    g.    The Bank's in-house appraiser, who was also a member of the MFREC, performed the appraisal for the Phillips Property, despite the Loan Policy

requirement that appraisals be independent of the lending/underwriting and collection process.

h.    Bringley was aware of the declining real estate market prior to approving this loan and failed to assess the viability of repayment of Loan 65085.

34.    By approving Loan 65085, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

35.    Borrower A defaulted on Loan 65085.

36.    As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to Loan 65085, the FDIC incurred damages of approximately $186,000.

**Loan 65086**

37.    The same day that Bringley approved Loan 65085, he approved a second loan to Borrower A in the amount of $560,000. This loan, number 65086 ("Loan 65086") was secured by Borrower A's 20-unit apartment building located at 7801-03 S. Saginaw (the "Saginaw Property") in Chicago, and was requested to pay off the existing $460,000 mortgage on that property and provide $100,000 cash to Borrower A for personal expenses and improvements on the property. The repayment terms for Loan 65086 were 240 equal payments of principal and interest. The loan was set to mature on March 1, 2026.

38.    As stated in the loan proposal, Borrower A had an adjusted gross income of -$21,593. Repayment sources for the loan were: (i) cash flow from rental units owned by Borrower A; and (ii) liquidation of the Saginaw Property.

39.    Bringley's approval of Loan 65086 violated the Bank's Loan Policy and safe and sound banking practices, and lacked due care in several respects, including, but not limited to, the following:

a. Bringley exceeded his $500,000 individual authority in approving Loan 65086 and failed to seek the required committee approval.

b. Bringley failed to analyze Borrower A's ability to repay the loans.

c. Bringley failed to perform or require a global cash flow analysis for Borrower A.

d. Bringley failed to require Borrower A to provide the required financial statements or complete a loan application.

e. Bringley failed to obtain a credit report for Borrower A.

f. The cash flow projections used in the loan proposal were simply estimates provided by Borrower A and were not verified.

g. The Bank's in-house appraiser, who was also a member of the MFREC, performed the appraisal for the Saginaw Property, despite the Loan Policy requirement that appraisals be independent of the lending/underwriting and collection process.

h. Bringley was aware of the declining real estate market prior to approving this loan and failed to assess the viability of repayment of Loan 65086.

40.     By approving Loan 65086, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

41.     Borrower A defaulted on Loan 65086.

42.     As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to Loan 65086, the FDIC incurred damages of approximately $232,000.

**Loan 65882**

43.     The third loan, number 65882 ("Loan 65882"), was a $100,000 loan secured by a second mortgage on the Phillips Property and was requested by Borrower A for property improvements. Bringley approved this loan on or about October 5, 2007, without a loan proposal, as required by the Loan Policy.

44.     The repayment terms for Loan 65882 were 240 equal payments of principal and interest. The loan was set to mature on November 1, 2027. The LTV ratio was based on an appraisal from two years earlier, instead of a current appraisal as required by the Loan Policy.

45.     Repayment sources for the loan were: (i) cash flow from rental units owned by Borrower A; and (ii) liquidation of the Phillips Property, which was already encumbered by a first mortgage owed to the Bank for $660,000.

46.     Bringley's approval of Loan 65882 violated the Bank's Loan Policy and safe and sound banking practices, and lacked due care in several respects, including, but not limited to, the following:

> a.     Bringley failed to analyze Borrower A's ability to repay the loan.
>
> b.     Bringley failed to require a loan proposal prior to his approval of Loan 65882.
>
> c.     Bringley failed to obtain the required tax returns, financial statements and a loan application from Borrower A.
>
> d.     Bringley failed to perform or require a global cash flow analysis for Borrower A.
>
> e.     Bringley failed to obtain a credit report for Borrower A.
>
> f.     Bringley failed to obtain an updated appraisal for the Phillips Property before approval or funding Loan 65882 to ensure that the collateral was sufficient to cover this debt, given that the collateral was a junior lien on the Phillips Property and the decline in the real estate market between 2006 and 2007.
>
> g.     Bringley was aware of the declining real estate market prior to approving this loan and failed to assess the viability of repayment of Loan 65882.

47.     By approving Loan 65882, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

48.     Borrower A defaulted on Loan 65882.

11

49.     As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to Loan 65882, the FDIC incurred damages of approximately $97,000.

**Loan 66019**

50.     On January 28, 2008, Bringley approved loan number 66019 ("Loan 66019") which was a $100,000 loan requested by Borrower A for additional improvements on the Saginaw Property. Loan 66019 was secured by a second mortgage on the Saginaw Property.

51.     The repayment terms for Loan 66019 were 240 equal payments of principal and interest.    The loan was set to mature on March 1, 2028. The LTV ratio was based on an appraisal from two years earlier, instead of a current appraisal as required by the Loan Policy.

52.     As stated in the loan proposal, Borrower A had an adjusted gross income of -$21,593. However, this figure was based on Borrower A's 2004 tax return. Repayment sources for the loan were: (i) cash flow from rental units owned by Borrower A; and (ii) liquidation of the Saginaw Property, which was already encumbered by a first mortgage owed to the Bank of $560,000.

53.     Bringley's approval of Loan 66019 violated the Banks Loan Policy and safe and sound banking practices, and lacked due care in several respects, including, but not limited to, the following:

a.     Bringley failed to analyze Borrower A's ability to repay the loan.

b.     Bringley failed to obtain the required tax returns, financial statements and a loan application from Borrower A.

c.     Bringley failed to perform or require a global cash flow analysis for Borrower A

d.     Bringley failed to obtain a credit report for Borrower A.

e.     Bringley failed to obtain an updated appraisal for the Saginaw Property before approval or funding Loan 66019 to ensure that the collateral was sufficient to cover this debt, given that the collateral was a junior lien on

the Saginaw Property and the decline in the real estate market between 2006 and 2007.

f.    Bringley was aware of the declining real estate market prior to approving this loan and failed to assess the viability of repayment of Loan 66019.

54.    By approving Loan 66019, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

55.    Borrower A defaulted on Loan 66019.

56.    As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to Loan 66019, the FDIC incurred damages of approximately $97,000.

**Loan 66269**

57.    On September 10, 2008, Bringley approved loan number 66269 ("Loan 66269"), which was a $100,000 loan requested by Borrower A for additional improvements on the Phillips Property. Loan 66269 was secured by a third mortgage on the Phillips Property. Bringley approved Loan 66269 without a loan proposal, which was required by the Loan Policy.

58.    The repayment terms for Loan 66269 were 12 interest-only payments beginning on November 1, 2008, followed by 287 equal payments of principal and interest. The loan was set to mature on October 1, 2033. The LTV ratio was based on an appraisal from two years earlier, instead of a current appraisal as required by the Loan Policy.

59.    Repayment sources for the loan were: (i) cash flow from rental units owned by Borrower A; and (ii) liquidation of the Phillips Property, which was already encumbered by first and second mortgages owed to the Bank totaling $760,000.

60.    Bringley's approval of Loan 66269 violated the Bank's Loan Policy and safe and sound banking practices, and lacked due care in several respects, including, but not limited to, the following:

13

a.    Bringley failed to analyze Borrower A's ability to repay the loan.

b.    Bringley failed to require a loan proposal prior to his approval of Loan 66269.

c.    Bringley failed to obtain the required tax returns, financial statements and a loan application from Borrower A.

d.    Bringley failed to perform or require a global cash flow analysis for Borrower A.

e.    Bringley failed to obtain a credit report for Borrower A.

f.    Bringley failed to obtain an updated appraisal for the Phillips Property before approval or funding Loan 66269 to ensure that the collateral was sufficient to cover this debt, given that the collateral was a tertiary junior lien on the Phillips Property and the decline in the real estate market between 2006 and 2007.

g.    Bringley was aware of the declining real estate market prior to approving this loan and failed to assess the viability of repayment of Loan 66269.

61.    By approving Loan 66269, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

62.    Borrower A defaulted on Loan 66269.

63.    As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to Loan 66269, the FDIC incurred damages of approximately $99,000.

**Loan to Cornell Ventures and Borrower B**

64.    On June 1, 2006, Bringley approved a $4 million loan to Cornell Ventures LLC and Borrower B (the "Cornell Loan") to provide additional cash to fund construction for the conversion of a 120-unit rental property to a 72 2-bedroom condominium building located at 5346 S. Cornell in Chicago (the "Cornell Property"). This was the third loan made to Cornell Ventures and Borrower B for this property. The first two loans, for $6 million and $4 million were disbursed to the borrower in May 2005 and June 2005.

65.     At the time that Borrower B requested the Cornell Loan, he was the Bank's largest borrower and owed the Bank over $20 million.

66.     The repayment sources for this loan were: (i) projected sales of the completed units; (ii) Borrower B's income; and (iii) liquidation of the Cornell Property.

67.     Pursuant to the loan proposal, the repayment terms for the Cornell Loan were monthly installments of accrued interest, with one lump sum payment of the outstanding principal and interest due on June 1, 2008.

68.     The loan proposal included estimated gross project revenue but did not include the basis for the estimate, a business plan, or a construction budget for the project. Without that information, which was required by the Loan Policy, Bringley could not analyze the viability of the project, confirm the estimates provided by the borrower for the average sale price of completed condominium units, or meaningfully assess whether the projected profits from the project could repay the loan.

69.     Bringley's approval of the Cornell Loan violated the Bank's Loan Policy and safe and sound banking practices, and lacked due care in several respects, including, but not limited to, the following:

     a.     Bringley exceeded his $500,000 individual authority in approving the Cornell Loan and failed to seek the required committee approval.

     b.     Bringley relied on Borrower B's estimates of gross sales, without any analysis or verification. Therefore, he had no way to determine if the projected sales actually provided a sufficient repayment source for the loan.

     c.     Borrower B owed the Bank over $20 million before this loan was disbursed. Bringley performed no analysis to verify that the borrower could repay this additional debt.

     d.     Bringley failed to obtain the required 2005 tax returns from Borrower B.

e.   Bringley failed to perform or require a global cash flow analysis for Borrower B.

f.   Bringley was aware of the declining real estate market prior to approving this loan and failed to assess the viability of repayment of the Cornell Loan.

70.   By approving the Cornell Loan, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

71.   Cornell Ventures LLC and Borrower B defaulted on the Cornell Loan.

72.   As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to the Cornell Loan, the FDIC incurred damages in excess of $2.407 million.

**LOACQ Loans**

73.   Bringley approved three loans to LOACQ, LLC ("LOACQ"). The three LOACQ loans included an original $13.5 million loan approved on June 19, 2006, and two cash loan modifications that provided an additional $3 million on March 26, 2007, and an additional $10.2 million on August 8, 2007, for a total credit extension of $26.7 million. The loans were intended to refinance four existing loans that funded the purchase of the LOACQ warehouse in Chicago and to finance pre-construction and phase 1 construction of a condominium development. There were three Guarantors for the LOACQ loans, Guarantors A, B and C.

74.   At the time that the original LOACQ loan was requested, Guarantor A was one of the Bank's largest borrowers and owed the Bank over $17 million.

75.   The original $13.5 million loan was secured by a first deed of trust on the property. The loan required interest-only payments for two years followed by a balloon payment of the total outstanding principal balance on July 1, 2008. The cash loan modifications were

intended to fund cost overruns from phase 1 construction and provide financing for phase 2 construction.

76.     The repayment sources for the LOACQ loans were: (i) proceeds from the sale of the completed condominium units; (ii) liquidation of collateral properties; and (iii) guarantees from Guarantors A, B and C.

77.     Bringley's approval of the original LOACQ loan and its modifications violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

a.      Bringley failed to adequately analyze the repayment sources.

b.      Bringley relied on Guarantor A's estimates of gross sales, without any required analysis or verification in approving the original loan and cash modifications. Therefore, he had no way to determine if the projected sales actually provided a sufficient repayment source for the loans.

c.      Bringley failed to require the three guarantors to provide financial statements.

d.      Based on the information provided in and documents provided with the loan proposal, Bringley knew that the guarantors lacked adequate income or net worth to repay the LOACQ loans.

e.      Bringley failed to perform or require a global cash flow analyses for LOACQ or the guarantors.

f.      Bringley knew that Guarantor A, one of the Bank's largest borrowers, was experiencing liquidity problems prior to approving the cash modifications, further evidencing that Guarantor A did not represent an adequate repayment source.

78.     By approving the LOACQ Loans, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

79.     LOACQ defaulted on the LOACQ loans.

80.     As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to the LOACQ loans, the FDIC incurred damages in excess of $20.7 million.

**1216 W. Winnemac Loan to Borrowers C and D**

81.     On August 14, 2006, Bringley approved a $1,835,000 loan (the "Winnemac Loan") to Borrower C and Borrower D who formed 1216 W. Winnemac, LLC ("Winnemac") to finance the purchase and rehabilitation of a three-story condominium building in Chicago.

82.     The payment terms for the Winnemac Loan were 24 interest-only payments beginning November 1, 2006, with a final balloon payment of principal plus interest on October 1, 2008.  The collateral for the loan was the property located at 1216 W. Winnemac (the "Winnemac Property").  The repayment sources for the Winnemac Loan were: (i) proceeds from the sale of the condominium units; (ii) the Borrowers' income; and (iii) liquidation of the Winnemac Property.  Bringley failed to obtain an appraisal for the Winnemac Property prior to loan origination as required by the Loan Policy.  Thus, he had no LTV ratio to consider prior to approving the Winnemac Loan.

83.     Bringley's approval of the Winnemac Loan violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

> a.     Bringley failed to obtain or require an appraisal of the Winnemac Property prior to loan approval and disbursement of the funds, and therefore, did not know if the property provided a sound repayment source at the time that he approved the loan.
>
> b.     Bringley failed to perform or require a global cash flow analysis and loan application.
>
> c.     The cash flow projections and informal budget costs for Winnemac set forth in the loan proposal were simply estimates provided by the Borrowers and were not validated.   Therefore, Bringley could not determine if the Winnemac Loan would be sufficient to complete the project, which was necessary to provide a timely and adequate repayment source.
>
> d.     Bringley did not perform an analysis of the Borrowers' ability to repay the loan.

e.  Based on the information provided in and documents provided with the loan proposal, Bringley knew that Borrowers C and D lacked adequate income or net worth to repay the Winnemac Loan.

f.  Both Borrower C and Ds' assets were highly concentrated in real estate, which should have alerted Bringley to repayment problems, especially given his knowledge of the declining real estate market beginning in December 2005.

84.  By approving the Winnemac Loan, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

85.  Borrowers C and D defaulted on the Winnemac Loan.

86.  As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to the Winnemac Loan, the FDIC incurred damages in excess of $884,000.

**Loans to Borrower E**

87.  Between November 2006 and March 2007, Bringley approved four Target Loans to Borrower E, totaling $ 1.674 million.

**Loans 65464 and 65465**

88.  On November 13, 2006, Bringley approved loan 65464 ("Loan 65464") in the amount of $436,100. That same day, Bringley approved loan 65465 ("Loan 65465") in the amount of $50,000. The purpose of Loan 65464 was to purchase and rehabilitate a vacant eight-unit apartment building. Loan 65465 was for the down payment to purchase that vacant eight-unit building.

89.  The repayment terms for Loan 65464 were 12 monthly interest payments beginning on October 10, 2007, followed by 227 monthly principal payments of principal and interest beginning on October 10, 2008. The repayment terms for Loan 65465 were 240 payments of principal and interest beginning January 1, 2007. The Bank funded Loan 65465 on

November 15, 2006 in the amount of $50,000. The Bank funded Loan 65464 on November 16, 2006 in the amount of $436,100.

90. Based on the loan proposal, the loans were to have a combined LTV ratio of 80 percent of the combined purchase price. There were no guarantors on the loan. Loan 65454 was secured with a first mortgage on the property. Loan 65465 was secured with a second mortgage on the property. The property appraised at $250,000 "as is" and $490,000 "post rehab."

91. Repayment sources for the loans were: (i) cash flow from the projected sale of eight condominium units; (ii) the borrower's income; and (iii) liquidation of property collateral.

92. Bringley's approval of Loans 65464 and 65465 violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

    a.    Bringley did not require Borrower E to provide cash flow projections, a construction budget or rehabilitation timeline to determine if the sale of the units would provide a timely and adequate repayment source.

    b.    Bringley failed to perform or require a global cash flow analysis.

    c.    The loan proposal did not include any information regarding Borrower E's ability to repay the loan.

    d.    Loans 65464 and 65465 violated the Bank's requirement that all loans had to have a loan to value ratio ("LTV") of 80 percent or less. Loans 65464 and 65465 had an LTV of at least 99 percent. In addition to violating the Bank's Loan Policy, this collateral did not provide a sound repayment source.

    e.    Bringley failed to obtain financial statements and tax returns from Borrower E.

    f.    Bringley failed to evaluate Borrower E's ability to repay Loans 65464 and 65465.

    g.    Borrower E's credit report showed FICO scores of 539, 534 and 531, with issues of "serious delinquency," "public record of collection filed," and "level of delinquency on accounts, and proportion of balance to credit limits is too high."

93.     By approving Loans 65464 and 65465, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

94.     Borrower E defaulted on Loans 65464 and 65465.

95.     As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to Loans 65464 and 65465, the FDIC incurred damages in excess of $475,000.

**Loan 65293**

96.     On December 26, 2006, Bringley approved a $750,000 line of credit to Borrower E for the purchase, rehabilitation and sale of a single family home and duplex buildings located in Chicago ("Loan 65293"). The repayment terms for Loan 65293 were interest-only payments due each month, with principal payments due as properties were sold. The loan was set to mature on December 1, 2007.

97.     There were no guarantors for the loan. Repayment sources for the loan were: (i) cash flow from the projected sale of the purchased properties; (ii) the borrower's income; and (iii) liquidation of property collateral. Loan 65293 was secured by a collateral assignment of beneficial interest in the land trust that held the title on all of the buildings purchased through the line of credit.

98.     Bringley's approval of Loan 65293 violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

     a.    Bringley did not require Borrower E to provide cash flow projections, a construction budget or rehabilitation timeline to determine if the sale of the properties would provide a timely and adequate repayment source.

     b.    Bringley failed to perform or require a global cash flow analysis.

c.   The loan proposal did not include any information regarding Borrower E's ability to repay the loan.

d.   Bringley failed to obtain the required financial statements and tax returns from Borrower E.

e.   Bringley failed to evaluate Borrower E's ability to repay Loan 65293.

f.   Borrower E's credit report showed FICO scores of 539, 534 and 531, with issues of "serious delinquency," "public record of collection filed," and "level of delinquency on accounts, and proportion of balance to credit limits is too high."

g.   Bringley failed to ensure that the collateral property was placed in the land trust, as required by the loan commitment letter.

h.   Bringley failed to obtain the required appraisals for the collateral properties.

99.   By approving Loan 65293, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

100.   Borrower E defaulted on Loan 65293.

101.   As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to Loan 65293, the FDIC incurred damages in excess of $555,000.

**Loan 65618**

102.   The fourth loan, number 65618 ("Loan 65618"), was a $438,000 loan extended to Borrower E to purchase and rehabilitate a three-unit condominium building in Chicago. Bringley approved Loan 65618 on or about March 26, 2007. The repayment terms for Loan 65618 were 12 monthly interest payments beginning on May 1, 2007, followed by 227 monthly principal payments of principal and interest beginning on May 1, 2008. The collateral for Loan 65618 was the three-unit purchased property.

22

103.    There were no guarantors for the loan.  Repayment sources for Loan 65618 were: (i) cash flow from the projected sale of three condominium units; (ii) the borrower's income; and (iii) liquidation of property collateral. The March 26, 2007 loan proposal included an estimate that the LTV was 90 percent of the purchase price.

104.    Bringley's approval of Loan 65618 violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

a.    Bringley did not require Borrower E to provide cash flow projections, a construction budget or rehabilitate timeline to determine if the sale of the units would provide a timely and adequate repayment source.

b.    Bringley failed to perform or require a global cash flow analysis.

c.    The loan proposal did not include any information regarding Borrower E's ability to repay the loan.

d.    Bringley failed to obtain the required financial statements and tax returns from Borrower E.

e.    Bringley failed to evaluate Borrower E's ability to repay Loan 65293.

f.    Borrower E's credit report showed FICO scores of 539, 534 and 531, with issues of "serious delinquency," "public record of collection filed," and "level of delinquency on accounts, and proportion of balance to credit limits is too high."

g.    Bringley failed to obtain the required appraisal of the collateral property prior to approving and disbursing the loan proceeds, as required by the Loan Policy.

h.    The appraisal, which was competed after the loan proceeds had been disbursed, revealed that the LTV of 98 percent was well in excess of both the 80 percent LTV limit set forth in the Loan Policy and the estimated 90 percent LTV in the loan proposal.

105.    By approving Loan 65618, despite the foregoing deficiencies, Bringley failed to exercise due care and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

23

106. Borrower E defaulted on Loan 65618.

107. As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to Loan 65618, the FDIC incurred damages in excess of $425,000.

**Loan to Borrower F**

108. On or about March 5, 2007, Bringley approved a $1,120,000 loan to Borrower F (the "Borrower F Loan") to pay off a line of credit owed to the Bank for the purchase of two properties at 1245 and 1251 S. California in Chicago (the "California Properties"), and to provide $416,000 for rehabilitation of the properties.

109. The repayment terms were 12 months of interest-only payments beginning June 1, 2007, followed by principal plus interest monthly payments beginning on June 1, 2008, for 228 months.

110. The Borrower F Loan was secured by an interest in the California Properties. Bringley did not require any guarantees for this loan. Repayment sources for the loan were: (i) the borrower's income; and (ii) liquidation of property collateral. The loan proposal indicated that the collateral properties were almost vacant, in poor condition and would require a complete rehabilitation to bring the properties to market.

111. Bringley's approval of the Borrower F Loan violated the Bank's Loan Policy and safe and sound banking practices, and lacked due care in several respects, including, but not limited to, the following:

      a.     Bringley failed to analyze Borrower F's financial statement and ability to repay the loan.

      b.     The financial statement provided was undated and unverified. This statement and the tax returns revealed that Borrower F did not have the income or assets to repay the loan.

      c.     Bringley failed to perform or require a global cash flow analysis.

d. Borrower F's 2006 credit report showed a FICO score of 547, with issues of "serious delinquency;" "public record of collection filed;" and "level of delinquency on accounts, and proportion of balance to credit limits is too high."

e. The LTV for the Borrower F Loan was 100 percent, despite the Bank's policy that LTVs for all loans should not exceed 80 percent.

f. At the time that Bringley approved the Borrower F Loan, he knew that Borrower F was already indebted to the Bank for $1.53 million. Bringley failed to analyze whether Borrower F would be able to repay the Borrower F Loan with this his pre-existing indebtedness to the Bank.

112. By approving the Borrower F Loan, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

113. Borrower F defaulted on the Borrower F Loan.

114. As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to the Borrower F Loan, the FDIC incurred damages in excess of $831,000.

**The 619 LaSalle Loan**

115. On or about September 28, 2007, Bringley approved and funded an $11 million loan to Borrowers G, H and I (the "LaSalle Loan") to pay off a first mortgage owed to First Midwest Bank for the purchase of the property at 619 LaSalle in Chicago (the "LaSalle Property"), to pay off first and second mortgages held by the Bank for the purchase of a parking lot, and to provide funds for renovations of the LaSalle Property. The plan was to convert the building into 24 live/work lofts on the upper level and 59 office spaces on the lower levels (the "LaSalle Project").

116. Borrower G was one of the Bank's largest borrowers, owing approximately $22 million to the Bank prior to the LaSalle Loan. Borrowers H and I each held a 10 percent interest in the LaSalle Project.

117.    The repayment terms for the LaSalle Loan were 24 interest-only payments beginning on November 1, 2007, followed by 335 equal payments of principal and interest. The loan was set to mature on October 1, 2037.

118.    The repayment sources for the loan were: (i) cash flow from the projected sale of the loft units and parking spaces; (ii) the Borrowers' income; and (iii) liquidation of the LaSalle Property. The loan proposal listed the LTV ratio as 84 percent.

119.    Bringley's approval of the LaSalle Loan violated the Bank's Loan Policy and safe and sound banking practices, and lacked due care in several respects, including, but not limited to, the following:

a.    Bringley failed to adequately analyze the repayment sources.

b.    Bringley failed to require the Borrowers to provide a construction budget. Without a budget, Bringley could not determine if the loan would be sufficient to complete the project, in order to provide a timely and adequate repayment source.

c.    Bringley did not require a financial statement or tax returns for Borrower G prior to approval.

d.    Tax returns and  financial statements for Borrowers H and I provided no evidence that they could repay the loan.

e.    Bringley failed to perform or require a global cash flow analysis to assign risk and determine the borrowers' ability to pay the loan.

f.    The LTV for the LaSalle Loan was 84 percent, which is in excess of the 80 percent LTV requirement for all loans.

g.    Borrower G did not have strong credit and had a general history of delinquency with other lenders, neither of which Bringley considered prior to approval.

120.    By approving the LaSalle Loan, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

121. Borrowers G, H and I defaulted on the LaSalle Loan.

122. As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to the LaSalle Loan, the FDIC incurred damages in excess of $6.61 million.

**The Loan to Borrowers J and K**

123. On or about October 29, 2007, Bringley approved a loan to Borrowers J and K in the amount of $2,318,000 (the "Borrower J Loan") to acquire land and build two eight-unit condominium buildings located at 5726-30 S. Prairie in Chicago (the "Prairie Properties").

124. The repayment terms for the Borrower J Loan were 24 interest-only payments beginning on January 1, 2008, followed by a lump sum payment of principal and outstanding interest on December 1, 2009. The Borrower J Loan was secured by the Prairie Properties.

125. The repayment sources for the loans were: (i) cash flow from the projected sale of the condominium units; (ii) the borrowers' income; and (iii) liquidation of the Prairie Properties. The loan proposal estimated the LTV ratio to be 66 percent, but no appraisal was performed prior to loan approval and disbursement.

126. Bringley's approval of the Borrower J Loan violated the Bank's Loan Policy and safe and sound banking practices in several respects, including, but not limited to, the following:

a. Bringley failed to adequately analyze the repayment sources.

b. The cash flow projections and informal budget costs set forth in the loan proposal were simply estimates provided by the Borrowers and were not validated. Therefore, Bringley could not determine if the loan would be sufficient to complete the project, in order to provide a timely and adequate repayment source.

c. Bringley relied on stale net worth statements for Borrowers J and K, which were over one year old, and failed to require Borrowers J and K to provide tax returns for 2006, as required by the Loan Policy.

d. Bringley failed to perform or require a global cash flow analysis to assign risk and determine ability to pay the loan.

27

e.      Bringley failed to obtain the required appraisal of the subject property prior to approving the loan and disbursing the loan proceeds. In fact, the appraisal was performed six months after the Borrower J Loan was approved and disbursed. The appraisal revealed that the LTV was approximately 152 percent, well in excess of the 80 percent LTV requirement for all loans and the 66 percent estimated LTV in the loan proposal.

f.      Bringley exceeded his individual approval authority by approving the Borrower J Loan without seeking the required committee approval.

127.    By approving the Borrower J Loan, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

128.    Borrowers J and K defaulted on the Borrower J Loan.

129. .  As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to the Borrower J Loan, the FDIC incurred damages in excess of $2.099 million.

**The Marshall Boulevard Partners Loan**

130.    The Marshall Boulevard Partners Loan, loan number 65988 (the "Marshall Loan"), was an $8,400,000 loan requested for the purpose of refinancing the existing $7,675,000 mortgage on the property located at 2100 S. Marshall Blvd in Chicago (the "Marshall Property") and to provide additional funds to complete the renovations and build-out of the building and the adjacent parking lot. The loan was secured by a mortgage on the Marshall Property, which was an eight-story brick former warehouse building which had been converted to residential condominium units. Bringley approved the Marshall Loan on January 18, 2008. Borrowers B and G guaranteed the Marshall Loan.

131.    At the time of the loan proposal, Borrower B was one of the Bank's largest borrower and had existing outstanding debt to the Bank of $23,037,240. Borrower G had existing debt to the Bank of $16,259,800.

132.    The repayment terms for the Marshall Loan were 18 monthly interest payments beginning on March 1, 2008, followed by 341 monthly payments of principal and interest beginning on September 1, 2009, with a variable interest rate. The Marshall Loan was set to mature on February 1, 2038.

133.    The repayment sources for the loans were: (i) cash flow from the projected sale of the condominium units; (ii) the borrowers' income; and (iii) liquidation of Marshall Property collateral.

134.    Bringley's approval of the Marshall Loan violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

    a.    Bringley failed to adequately analyze the repayment sources.

    b.    Bringley failed to require the Borrowers to provide a construction budget. Without a construction budget, Bringley could not determine if the loan would be sufficient to complete the project, in order to provide a timely and adequate repayment source.

    c.    Bringley failed to obtain the required financial statements, credit reports and tax returns from the Borrowers.

    d.    Bringley failed to perform or require a global cash flow analysis to assign risk and determine ability to pay the loan. Borrower B was one of the Bank's largest borrowers, and owed the Bank over $23 million prior to the approval of this loan. Borrower G had existing debt to the Bank of $16.25 million. Despite these facts, Bringley failed to analyze whether Borrowers B and G would be able to repay the new $8.4 million loan.

    f.    The appraisal was not performed by an independent appraiser. Instead, a member of the MFREC performed the appraisal, in violation of the Loan Policy requiring independent appraisals.

135.    By approving the Marshall Loan, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

136.    Borrowers B and G defaulted on the Marshall Loan.

137.    As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to the Marshall Loan, the FDIC incurred damages in excess of $4.58 million.

**The 7337 South Shore LLC Loan**

138.    On May 5, 2009, Borrower B applied for a $700,000 loan secured by second mortgages on his properties located at 7337 South Shore Drive and 4335 N. Ravenswood in Chicago. The loan, number 66468 (the "South Shore Loan"), was for the purpose of renovations and build-out of the Marshall Property.

139.    The repayment terms for the South Shore Loan were monthly interest payments beginning on August 1, 2009, and one payment of principal plus interest on July 1, 2012. The loan was set to mature on July 1, 2012. At the time of the loan, Borrower B had an existing debt to the Bank of $30,593,789.

140.    The repayment sources for the loan were: (i) cash flow from the projected sale of the Marshall Property condominium units; (ii) the borrower's income; and (iii) second mortgages on two properties owned by Borrower B.

141.    Bringley's approval of the South Shore Loan violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

a.      Bringley failed to adequately analyze the repayment sources.

b.      Bringley failed to require Borrower B to provide a construction budget. Without a construction budget, Bringley could not determine if the loan

would be sufficient to complete the project, in order to provide a timely and adequate repayment source.

c. Borrower B was one of the Bank's largest borrowers and was indebted to the Bank for $30 million at the time that this loan was approved, which violated the Credit Policy provision that the aggregate credit exposure to any one borrower not exceed $20 million.

d. Bringley failed to perform or require a global cash flow analysis to assign risk and determine ability to pay the loan despite Borrower B's $30 million indebtedness to the Bank. Bringley performed no analysis of whether Borrower B would be able to repay the new $700,000 loan.

142. By approving the South Shore Loan, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

143. Borrower B defaulted on the South Shore Loan.

144. As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to the South Shore Loan, the FDIC incurred damages in excess of $628,000.

**The Affordable Housing Coalition Loan**

145. On May 12, 2008, Bringley approved a $410,000 loan to the Affordable Housing Coalition ("AHC") and Borrowers L, M and N (the "AHC Loan"). The purpose of the loan was to provide the Borrowers with temporary working capital to complete renovations of three properties previously purchased through a line of credit the Borrowers maintained at the Bank.

146. At the time that the AHC Loan was approved, the Borrowers were experiencing strained cash flow and struggling to sell their rehabilitated properties. The AHC Loan was secured by second mortgages on 2 properties owned by Borrowers L, M and N.

147. The repayment sources for the loans were: (i) cash flow from the projected sale of the rehabilitated properties; (ii) the borrowers' income; and (iii) second mortgages on Borrowers L,M and N's residences.

148.    Bringley's approval of the AHC Loan violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

a.    Bringley failed to analyze the Borrowers' ability to repay the AHC Loan.

b.    Bringley failed to analyze the viability of the Borrowers being able to sell the three properties and repay the AHC Loan, given the Borrowers' inability to sell their other rehabilitated properties.

c.    The Borrowers' financial statements were more than one year old and showed that their income and net worth were not enough to repay the AHC Loan.

d.    The Borrowers had poor credit scores, further demonstrating their inability to repay the loan.

e.    Bringley failed to perform or require a global cash flow analysis to assign risk and determine ability to pay the loan.

f.    Bringley failed to monitor the construction draws for this loan. The three properties for which the AHC Loan was secured were never completed and were in poor condition.

g.    Bringley failed to obtain the required appraisal on the collateral properties prior to loan approval and disbursement, and therefore did not know if the properties provided adequate funds to cover the debt at the time that he approved the AHC loan.

149.    By approving the AHC Loan, despite the foregoing deficiencies, Bringley failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

150.    AHC and Borrowers L, M and N defaulted on the AHC Loan.

151.    As a result of Bringley's negligence, gross negligence, and breaches of fiduciary duty with respect to the AHC Loan, the FDIC incurred damages in excess of $400,000.

## The 8 BBLC Target Loans

## The English Village Loan

152.    On March 31, 2006, Amy and Rader, two members of the BBLC, approved a loan
in the amount of $450,000 to English Village Lofts ("English Village") to pay off an existing
$250,000 debt and to provide funds for soft costs (the "English Village Loan").   The borrower
planned to convert a three-story historic building in Detroit, Michigan into 12 condominium
units (the "Detroit Property").   English Village was expected to request a $3,000,000
construction loan from the Bank to finance the rehabilitation of the building, once the full plans
and specifications for the property were completed.   However, English Village was never able to
secure financing as the cost of renovations exceeded the value of the property after completion.

153.    Guarantors D and E guaranteed the English Village.   Guarantees were also
obtained from Commercial Detroit, Inc. and Residential Detroit, Inc., two companies run by
Guarantors D and E.

154.    The repayment terms for the English Village Loan were interest-only payments
beginning April 30, 2006.   Principal was to be paid when the borrower sold the condominium
units.   Regardless of whether any condominium units sold, the English Village Loan was to be
repaid by August 30, 2007.

155.    The English Village Loan was secured by a security interest in the Detroit
Property.   Repayment sources for the English Village Loan were: (i) cash flow from projected
sale of condominium units; (ii) guarantors' income; and (iii) liquidation of property collateral
which was the Detroit property, the residences of Guarantors D and E, and a property owned by
Residential Detroit.

156. Rader and Amy's approval of the English Village Loan violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

    a.    Rader and Amy failed to adequately analyze the repayment sources.

    b.    Rader and Amy knew that repayment of the English Village Loan was contingent upon English Village obtaining a $3 million construction loan, but failed to evaluate the viability of the Borrower obtaining that loan.

    c.    Rader and Amy failed to require the Borrower to provide a construction budget. Without a construction budget, Rader and Amy could not determine if the loan would be sufficient to complete the project, in order to provide a timely and adequate repayment source.

    d.    Rader and Amy failed to require financial statements or tax returns for English Village, as required by the Loan Policy.

    e.    Based on the loan presentation and documents provided to Rader and Amy along with the loan presentation, the guarantors lacked adequate income or net worth to repay the English Village Loan.

    f.    Rader and Amy failed to require the entity guarantors to provide current financials, balance sheets or liquidity statements.

    g.    Rader and Amy failed to perform or require a global cash flow analysis to assign risk and determine ability to pay the loan.

    h.    Guarantors D and E had subpar credit scores, further demonstrating their inability to repay the loan.

    i.    Rader and Amy failed to obtain the required appraisals for the collateral property pledged by Guarantors D and E.

157. By approving the English Village Loan, despite the foregoing deficiencies, Rader and Amy failed to exercise due care and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

158. English Village defaulted on the English Village Loan.

159. As a result of Rader and Amy's negligence, gross negligence, and breaches of fiduciary duty with respect to the English Village Loan, the FDIC incurred damages in excess of

$450,000.

## The Family and Faith Church Loan

160.    On March 23, 2006, BBLC members Rader and Smith approved a $1,650,000 loan (the "Church Loan") to Family and Faith Christian Church (the "Church"). The purpose of the loan was to pay down existing debt and reestablish cash reserves. Guarantors F, G and H guaranteed the Church Loan.

161.    The repayment terms for the Church Loan were 59 monthly payments of principal and interest and one balloon payment due on May 26, 2011. The loan presentation required that the Church Loan have an LTV ratio of 80 percent or lower.

162.    Repayment sources for the Church Loan were: (i) tithes and offerings from church members; (ii) the Guarantors' income; and (iii) liquidation of the property collateral, which was the church building.

163.    Rader and Smith's approval of the Church Loan violated the Bank's Loan Policy and safe and sound banking practices in several respects, including, but not limited to, the following:

> a.    Rader and Smith failed to adequately analyze the repayment sources.
>
> b.    The Church's financial statements revealed that it was in poor financial condition, had negative working capital and had no ability to repay the Church Loan.
>
> c.    Rader and Smith failed to require tax returns or financial statements from the Guarantors and tax returns from the Church, as required by the Loan Policy.
>
> d.    Based on the loan proposal provided to Rader and Smith prior to their approval, they knew that two of the Guarantors had a net worth of $0, and the third Guarantor had a net worth of $221,000, showing that they lacked the ability to repay the Church Loan.
>
> e.    Rader and Smith failed to perform or require a global cash flow analysis to assign risk and determine ability to pay the loan.

    f.      Rader and Smith failed to ensure that an appraisal was obtained for the Church building prior to closing, as required by the loan presentation.

    g.     By failing to obtain an appraisal, Rader and Smith could not determine if the church building was sufficient to cover this debt.

164.    By approving the Church Loan, despite the foregoing deficiencies, Rader and Smith failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

165.    The Church defaulted on the Church Loan.

166.    As a result of Rader and Smith's negligence, gross negligence, and breaches of fiduciary duty with respect to the Church Loan, the FDIC incurred damages in excess of $887,000.

**The Bayview Apartments Loan**

167.    On or about June 8, 2006, BBLC members Amy, Rader and Smith approved a loan to Bayview Apartments, LLC ("Bayview") in the amount of $3.5 million (the "Bayview Loan"). The purpose of the Bayview Loan was to purchase the Bayview apartment building in Lansing, Michigan and renovate 36 apartment units. The collateral for the Bayview Loan was twelve two-story walk-up apartment buildings with 136 units, situated on 11.82 acres of land. Guarantor I also guaranteed the Bayview Loan.

168.    The repayment terms for the Bayview Loan were six, interest-only payments, followed by principal and interest payments for five years. At the end of the five year period, a balloon payment for the remaining principal and interest would be due.

169.    Repayment sources for the loan were: (i) cash flow from rental units; (ii) guarantors' income; and (iii) liquidation of property collateral.

170.    Rader, Amy and Smith's approval of the Bayview Loan violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

      a.    Rader, Amy and Smith failed to adequately analyze the repayment sources.

      b.    Rader, Amy and Smith failed to obtain the required tax returns, financial statements and a loan application from Bayview.

      c.    The loan presentation required a minimum DSCR of 1.15x. As of the date of loan presentation, the Bayview Loan had a DSCR of .62x. Therefore, the collateral was insufficient because it would not generate the required cash flow to pay the loan.

      d.    Guarantor I's reported net worth statement, which Rader, Amy and Smith had at the time of approval, revealed that he did not have adequate income to repay the Bayview Loan and did not provide a sound repayment source.

      e.    Rader, Amy and Smith failed to perform or require a global cash flow analysis to assign risk and determine ability to pay the loan.

171.    By approving the Bayview Loan, despite the foregoing deficiencies, Rader, Amy and Smith failed to exercise due care and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

172.    Bayview defaulted on the Bayview Loan.

173.    As a result of Rader, Amy and Smith's negligence, gross negligence, and breaches of fiduciary duty with respect to the Bayview Loan, the FDIC incurred damages in excess of $3.711 million.

**The Cattleman's Incorporated Loan**

174.    On July 14, 2006, BBLC members Rader, Amy and Smith approved a $3,270,000 loan (the "Cattleman's Loan") to Cattleman's Inc. ("Cattleman's"). The purpose of the loan was to refinance existing debt owed to LaSalle Bank. Guarantors J and K guaranteed the Cattleman's Loan.

175.     The repayment terms for the Cattleman's Loan were principal and interest payments for five years, with a balloon payment for the outstanding loan amount due on October 1, 2011.  Repayment sources for the loan were: (i) cash flow from business sales; (ii) the Guarantors' income; and (iii) liquidation of property collateral, which was the Cattleman's meat packing facility.

176.     The Bank funded the loan on September 26, 2006.  Cattleman's made no loan payments after December 29, 2006.

177.     Rader, Amy and Smith's approval of the Cattleman's Loan violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

a.     Rader, Amy and Smith failed to adequately analyze the repayment sources.

b.     Cattleman's was experiencing operating problems when the loan was approved. Rader, Amy and Smith knew from the loan presentation that no analysis had been done regarding these issues, their impact on the viability of the business going forward, and how the business would generate enough income to repay the loan. Rader, Amy and Smith also failed to inquire about Cattleman's operating issues.

c.     Cattleman's financial statement, which Rader, Amy and Smith had at the time of approval, showed that it would not be able to generate the required cash to serve as a repayment source for the loan.

d.     Rader, Amy and Smith failed to obtain the required tax returns, financial statements and a loan application from Guarantors J and K, so they could not determine the Guarantors' ability to repay the loan. They also failed to obtain the required tax returns from Cattleman's.

e.     The collateral was a special use property, which the appraiser opined would take approximately 18-24 months to sell. Thus, this collateral did not provide a timely or sound source of repayment.

178.    By approving the Cattleman's Loan, despite the foregoing deficiencies, Rader, Amy and Smith failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

179.    Cattleman's defaulted on the Cattleman's Loan a few months after the loan was funded.

180.    As a result of Rader, Amy and Smith's negligence, gross negligence, and breaches of fiduciary duty with respect to the Cattleman's Loan, the FDIC incurred damages in excess of $3.032 million.

**St. Regis Hotel Partners Loan**

181.    On October 16, 2006, BBLC members Rader, Amy, Battle and Smith approved a $7,600,000 loan (the "St. Regis Loan") to St. Regis Detroit Partners ("St. Regis") for the cost of acquisition and renovation of a 124 room hotel located in downtown Detroit, Michigan and built in 1966 (the "Hotel"). They conditioned their approval upon the loan having a 60 percent LTV ratio. Guarantors L, M and N and Wilco Associates, LLC guaranteed the loan. Neither St. Regis nor the guarantors of the loan were hotel operators or had prior experience operating hotels.

182.    On December 21, 2006, after receiving an appraisal of the Hotel from CB Richard Ellis ("CBRE"), the St. Regis Loan was lowered to $7.44 million to maintain the 60 percent LTV condition placed on the approval. That same day, Rader, Amy, Battle and Smith approved a request to increase the St. Regis Loan by $1.24 million, raising the LTV to 70 percent. In exchange for the loan increase, St. Regis offered to pledge a $1.24 million certificate of deposit ("CD") to the Bank.

183.    The Bank funded the St. Regis Loan on January 19, 2007.  The repayment sources

for the St. Regis Loan were: (i) cash flow from operations, (ii) the Guarantors, and (iii)

liquidation of the Hotel property.

184.    The repayment terms for the St Regis Loan were interest-only payments for

twelve months.  Then the payments were scheduled to convert to equal payments of principal

and interest for five years.

185.    Rader, Amy, Battle and Smith's approval of the St. Regis  Loan violated the

Bank's Loan Policy and safe and sound banking practices and lacked due care in several

respects, including, but not limited to, the following:

   a.    Rader, Amy, Battle and Smith failed to adequately analyze the repayment
         sources.

   b.    Rader, Amy, Battle and Smith failed to obtain the required financial
         statements for St. Regis and two of the four Guarantors, as well as the
         required tax returns for all four guarantors.  Analyses of the financial
         statements provided by two of the Guarantors, which were available to
         Rader, Amy, Battle and Smith, were deficient.  A review of these
         financials revealed that the Guarantors did not have the ability to repay the
         loan.

   c.    Rader, Amy, Battle and Smith failed to verify St. Regis's income other or
         financials metrics and they did not conduct or require a global cash flow
         analyses.  Additionally, because Rader, Amy, Battle and Smith failed to
         analyze any financial statements or other documentation, they could not
         have known whether the cash flow from the operations of the Hotel were
         sufficient to repay the loan.

   d.    Amy, Smith and Battle approved the release of $400,000 of the CD money
         held as additional collateral in November 2007 to fund construction
         overruns and to provide working capital.  Amy and Rader released an
         additional $643,000 of the CD on May 29, 2008, to defray construction
         cost overruns from the rehabilitation of the Hotel. These actions further
         jeopardized the Bank's likelihood of repayment.

   e.    Rader, Amy, Battle and Smith failed to consider the lack of hotel
         management experience of the borrower and Guarantors in assessing the
         risk to the Bank of the St. Regis Loan.

186.    By approving the St. Regis Loan, despite the foregoing deficiencies, Rader, Amy, Battle and Smith failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

187.    St. Regis defaulted on the St. Regis Loan.

188.    As a result of Rader, Amy, Battle and Smith's negligence, gross negligence, and breaches of fiduciary duty with respect to the Cattleman's Loan, the FDIC incurred damages in excess of $7.112 million.

**Fort Shelby Loan**

189.    On April 9, 2007, BBLC members Rader, Amy, Battle and Smith approved a $14 million revolving construction loan to MCP Development LLC to provide bridge financing for the renovations of a historic Detroit landmark, the Fort Shelby Hotel (the "Fort Shelby Loan"). There were four guarantors for the Fort Shelby Loan, Guarantors O, P, Q and R. The primary source of repayment for the loan was an assignment of tax credits from Chevron Corporation for a conservation easement provided to the City of Detroit Development Authority.

190.    Additional repayment sources were: (i) cash flow from the Fort Shelby operations; (ii) guarantors; and (iii) liquidation of the collateral, the Fort Shelby Hotel property.

191.    Rader, Amy, Battle and Smith's approval of the Fort Shelby Loan violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

    a.    Rader, Amy, Battle and Smith failed to adequately analyze the repayment sources.

    b.    Rader, Amy, Battle and Smith failed to obtain the required tax returns for the Guarantors.

    c.    Analyses of the financial statements provided by the Guarantors, which were available to Rader, Amy, Battle and Smith, revealed that the

41

Guarantors' assets were concentrated primarily in non-liquid real estate assets, with limited liquid assets that could not support loan repayment.

d.    Despite the size of this loan and the lack of any other viable repayment source, Rader, Amy, Battle and Smith failed to analyze the viability of the federal tax credit and failed to obtain an outside opinion on the likelihood of the federal tax credit as a repayment source.

e.    The Bank had a third and fourth mortgage position on the collateral. Three other lenders had debt senior to the Bank for $52 million on the collateral. The property appraised at $46.6 million. Accordingly, the collateral was not an adequate repayment source.

192.    By approving the Fort Shelby Loan, despite the foregoing deficiencies, Rader, Amy, Battle and Smith failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

193.    The Borrower defaulted on the Fort Shelby Loan.

194.    As a result of Rader, Amy, Battle and Smith's negligence, gross negligence, and breaches of fiduciary duty with respect to the Fort Shelby Loan, the FDIC incurred damages in excess of $12.423 million.

**Urban Innovations Loan**

195.    On or about December 8, 2005, BBLC members Amy and Smith approved a loan to Urban Innovation Group, Inc. ("UIG") in the amount of $3,360,000 (the "UIG Loan"). The purpose of the loan was to pay off a $935,000 loan to the Bank for the purchase of a four-story building in Detroit, Michigan, and to pay the cost of construction for the rehabilitation of the building. The UIG Loan was secured by a first mortgage on the property. Guarantors S, T and U guaranteed the loan.

196.    The repayment terms for the UIG Loan were twelve interest-only payments, with one balloon payment for the outstanding balance of the loan due at loan maturity.

197. Repayment sources for the loan were: (i) cash flow from rental units; (ii) guarantors' income; and (iii) liquidation of property collateral.

198. On August 29, 2007, BBLC members Rader, Amy, Battle and Smith approved a $541,000 loan increase, which the Borrower requested to complete the project.

199. Rader, Amy, Battle and Smith's approval of the Urban Innovations Loan violated the Banks's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

    a. Rader, Amy, Battle and Smith failed to adequately analyze the repayment sources.

    b. UIG's tax returns, which were available to Rader, Amy, Battle and Smith, showed that the borrower had strained cash flow and no probable ability to repay the UIG Loan.

    c. Rader, Amy, Battle and Smith failed to obtain the required financial statements for the Guarantors and failed to require global cash flow analyses.

    d. The Guarantors had limited net worth, significant debt and also were experiencing strained cash flows.

    e. Two of the Guarantors had poor credit. Guarantor T had a credit score of 493 and Guarantor U had a credit score of 497.

    f. The loan presentation only included partial hard costs and lacked a detailed budget for the remaining project costs. Without a detailed budget, Rader, Amy, Battle and Smith could not determine if the loan would be sufficient to complete the project, in order to provide a timely and adequate repayment source.

    g. Rader, Amy, Battle and Smith did not require UIG to provide cash flow projections or a rehabilitation timeline to determine if the sale of the units would provide a timely and adequate repayment source.

200. By approving the UIG Loan, despite the foregoing deficiencies, Rader, Amy, Battle and Smith failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

201. UIG defaulted on the UIG Loan.

202. As a result of Rader, Amy, Battle and Smith's negligence, gross negligence, and breaches of fiduciary duty with respect to the UIG Loan, the FDIC incurred damages in excess of $3.901 million.

**The Chicago Christian Industrial Loan**

203. On August 8, 2008, BBLC members Rader and Amy approved a $650,000 line of credit ("LOC") to Chicago Christian Industrial League (the "CCIL"). The LOC was intended to fund a $315,000 overdraft at the Bank and provide CCIL with working capital. The LOC had a variable interest rate and was to be repaid in one lump sum payment of principal and accrued interest on November 28, 2008. Rader and Amy did not require guarantors or collateral for this loan.

204. Repayment sources for the loan were: (i) $500,000 in outstanding receivables from the City of Chicago; (ii) an unstated amount from an estimated $1.5 million to $2 million in proceeds from an anticipated property sale; and (iii) a junior lien on all "business assets." Neither the value of the business assets nor the amount of the senior lien was included in the loan presentation. Thus, the value of the junior lien was unknown.

205. Although this collateral facially appeared to cover the full amount of the LOC, the borrower already had $12.3 million in debt to the Bank, all of which was in default. A global cash flow analysis was not performed despite the borrower's existing debts and substandard risk rating of 7. Rader and Amy knew, at the time that they approved the LOC, that the borrower had lost its largest source of funding, the Bank's auditors had projected that the borrower had insufficient cash flow to service existing debt, and the economy already had entered into a deep recession.

206.    Rader and Amy's approval of the LOC violated the Bank's Loan Policy and safe and sound banking practices and lacked due care in several respects, including, but not limited to, the following:

a.    Rader and Amy failed to obtain the required loan application, financial statements, and tax returns from CCIL. They also failed to perform a financial analysis to determine CCIL's ability to repay the LOC.

b.    Rader and Amy failed to obtain any collateral, guarantees, or sound source of repayment for the LOC, as required by the Loan Policy.

c.    Rader and Amy knew or should have known that CCIL's contributions and grants had begun to decline well before the LOC was approved. Two years before the LOC was approved, CCIL was having liquidity issues. CCIL had lost its largest source of funding prior to the LOC being approved. Auditors had projected that CCIL had insufficient cash flow to service its existing debt, prior to the LOC being approved.

d.    Rader and Amy failed to require that a global cash flow analysis be performed.

207.    By approving the LOC, despite the foregoing deficiencies, Rader and Amy failed to exercise due care, and violated the Bank's Loan Policy, as well as prudent, safe, and sound lending practices.

208.    CCIL defaulted on the LOC.

209.    As a result of Rader and Amy's negligence, gross negligence, and breaches of fiduciary duty with respect to the LOC, the FDIC incurred damages in excess of $646,000.

## CLAIMS FOR RELIEF

### COUNT I
### Negligence (Illinois law) – Approval of Target Loans

210.    The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1-209, above, as if fully set forth in this Count.

211.    As officers of the Bank, the Defendants owed duties to the Bank to conduct its business consistent with safe and sound lending practices.  These duties included, but were not limited to, the following:

    a.    To manage, conduct, and direct the business and affairs of the Bank in accordance with and to ensure compliance with applicable laws, regulations, bylaws, Bank policies, and sound and prudent banking practices;

    b.    To actively review and approve or disapprove each loan;

    c.    To take such action as necessary to ensure that the Bank's loans were underwritten, approved, disbursed, and collected in accordance with the law, regulations, bylaws and Bank policies applicable thereto and in accordance with sound and prudent banking practices;

    d.    To exercise independent judgment in the best interests of the Bank in the conduct of its business and affairs; and

    e.    To ensure that the Bank did not engage in any unsafe or unsound practices.

212.    The Defendants breached their duties and were negligent by, *inter alia*, voting to approve the 28 Target Loans described above, in violation of the Bank's Loan Policy and prudent, safe, and sound lending practices, and by:

    a.    Failing to obtain borrower and guarantor financial information;

    b.    Relying on outdated, unverified, and inadequate financial information for borrowers and guarantors;

    c.    Failing to perform and/or ensure that global cash flow analyses were performed prior to loan approval;

    d.    Failing to properly assess the repayment ability of borrowers and/or guarantors;

    e.    Failing to ensure that loans were secured by sufficient collateral;

    f.    Extending credit in excess of permitted LTV ratio limits;

    g.    Approving loans in excess of individual approval authority and without proper committee approval;

     h.     Failing to obtain appraisals prior to loan origination;

     i.     Approving loans without adequate documentation; and

     j.     Permitting DSCRs below minimum requirements.

213.    As a direct and proximate result of the Defendants' negligence, the FDIC suffered damages in an amount to be determined at trial, now believed to be in excess of $73 million.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation as Receiver for ShoreBank demands trial by jury and judgment in its favor and against Defendants Drextel Amy, Olga V. Lakes-Battle, James Bringley, Eric Rader, and Thurman Smith in an amount to be determined at trial, for prejudgment interest, for its costs, and for such other and further relief as the Court deems just and proper.

## COUNT II
### *In the Alternative*
### Breach of Fiduciary Duty (Illinois law) – Approval of Target Loans

214.    The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1-209, above, as if fully set forth in this Count.

215.    The allegations in this Count are pleaded in the alternative to the allegations in Count I, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

216.    The Defendants owed the Bank fiduciary duties, individually and collectively, to exercise the highest degree of loyalty, care, diligence, and fair dealing in the management, conduct, and direction of the business of the Bank. These duties included, but were not limited to, the following:

     a.     To manage, conduct, and direct the business and affairs of the Bank in accordance with and to ensure compliance with applicable laws, regulations, bylaws, Bank policies, and sound and prudent banking practices;

     b.     To actively review and approve or disapprove each loan;

     c.     To take such action as necessary to ensure that the Bank's loans were underwritten, approved, disbursed, and collected in accordance with the law, regulations, bylaws and Bank policies applicable thereto and in accordance with sound and prudent banking practices;

     d.     To exercise independent judgment in the best interests of the Bank in the conduct of its business and affairs; and

     e.     To ensure that the Bank did not engage in any unsafe or unsound practices.

217.     The Defendants breached their fiduciary duties by, *inter alia*, voting to approve the 28 Target Loans described above, in violation of the Bank's loan policy and prudent, safe, and sound lending practices, and by:

     a.     Failing to obtain borrower and guarantor financial information;

     b.     Relying on outdated, unverified, and inadequate financial information for borrowers and guarantors;

     c.     Failing to perform and/or ensure that global cash flow analyses were performed prior to loan approval;

     d.     Failing to properly assess the repayment ability of borrowers and/or guarantors;

     e.     Failing to ensure that loans were secured by sufficient collateral;

     f.     Extending credit in excess of permitted LTV ratio limits;

     g.     Approving loans in excess of individual approval authority and without proper committee approval;

     h.     Failing to obtain appraisals prior to loan origination;

     i.     Approving loans without adequate documentation; and

     j.     Permitting DSCRs below minimum requirements.

218.     As a direct and proximate result of the Defendants' breaches of fiduciary duty, the FDIC suffered damages in an amount to be determined at trial, now believed to be in excess of $73 million.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation as Receiver for ShoreBank demands trial by jury and judgment in its favor and against Defendants Drextel Amy, Olga V. Lakes-Battle, James Bringley, Eric Rader, and Thurman Smith in an amount to be determined at trial, for prejudgment interest, for its costs, and for such other and further relief as the Court deems just and proper.

## COUNT III
### *In the Alternative*
### Gross Negligence (12 U.S.C. § 1821(k)) – Approval of Target Loans

219.    The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1-209, above, as if fully set forth in this Count.

220.    The allegations in this Count are pleaded in the alternative to the allegations in Count I, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

221.    During all relevant times alleged, the Defendants were officers of the Bank.

222.    Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") holds directors and officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.  Illinois law defines gross negligence as "very great negligence," but something less than willful, wanton, and reckless conduct.

223.    As officers of the Bank, the Defendants owed duties to the Bank to carry out their responsibilities by exercising the degree of care, skill, and diligence that ordinarily prudent persons in like positions would use under similar circumstances.  These duties included, but were not limited to, the following:

      a.     To manage, conduct, and direct the business and affairs of the Bank in accordance with and to ensure compliance with applicable laws, regulations, bylaws, Bank policies, and sound and prudent banking practices;

b.   To actively review and approve or disapprove each loan;

c.   To take such action as necessary to ensure that the Bank's loans were underwritten, approved, disbursed, and collected in accordance with the law, regulations, bylaws and Bank policies applicable thereto and in accordance with sound and prudent banking practices;

d.   To exercise independent judgment in the best interests of the Bank in the conduct of its business and affairs; and

e.   To ensure that the Bank did not engage in any unsafe or unsound practices.

224.   The Defendants breached their duties and were grossly negligent by, *inter alia*, voting to approve the 28 Target Loans described above, in violation of the Bank's loan policy and prudent, safe, and sound lending practices, and by:

a.   Failing to obtain borrower and guarantor financial information;

b.   Relying on outdated, unverified, and inadequate financial information for borrowers and guarantors;

c.   Failing to perform and/or ensure that global cash flow analyses were performed prior to loan approval;

d.   Failing to properly assess the repayment ability of borrowers and/or guarantors;

e.   Failing to ensure that loans were secured by sufficient collateral;

f.   Extending credit in excess of LTV ratio limits;

g.   Approving loans in excess of individual approval authority and without proper committee approval;

h.   Failing to obtain appraisals prior to loan origination;

i.   Approving loans without adequate documentation; and

j.   Permitting DSCRs below minimum requirements.

225.   As a direct and proximate result of the Defendants' gross negligence, the FDIC suffered damages in an amount to be determined at trial, now believed to be in excess of $73 million.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation as Receiver for

ShoreBank demands trial by jury and judgment in its favor and against Defendants Drextel Amy,

Olga V. Lakes-Battle, James Bringley, Eric Rader, and Thurman Smith in an amount to be

determined at trial, for prejudgment interest, for its costs, and for such other and further relief as

the Court deems just and proper.

DATED:        August 16, 2013


                                    /s/  Randall D. Lehner



Randall D. Lehner (#6237535)
Givonna L. Long (#6290076)
Kasey M. Folk (#6286176)
Ulmer & Berne LLP
500 W. Madison, Suite 3600
Chicago, IL 60661
312.658.6500
312.658.6501 (fax)
rlehner@ulmer.com
glong@ulmer.com
kfolk@ulmer.com

*Attorneys for Plaintiff*